Elijah M. Watkins, ISB No. 8977
elijah.watkins@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID  83702
Telephone:  208.389.9000
Facsimile:  208.389.9040

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHOSHONE-BANNOCK TRIBES; and FORT HALL BUSINESS COUNCIL,<br><br>Plaintiffs,<br><br>v.<br><br>VANIR CONSTRUCTION MANAGEMENT, INC.,<br><br>Defendant. | Case No. 4:23-cv-00160-REP<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY COUNSEL** |

## I.  INTRODUCTION

The Shoshone-Bannock Tribes, which are led by their executive committee, the Fort Hall Business Council (collectively, the "Tribes"), hired Vanir Construction Management, Inc. ("Vanir") to assist in the construction of its casino. Vanir was the Tribes' "owner representative," and Vanir's employees worked on an integrated construction management team with the Tribes'

employees. Bill Bacon, Paul Echo Hawk, and later Andrew Gabel (the "Lawyers") served as the Tribes' counsel for the project, and in that role the Lawyers necessarily interfaced with the construction management team (including Vanir's employees) to discuss what was happening with the project, to monitor and even draft or revise communications between Vanir and the project's general contractor, and to advise the Tribes and Vanir on legal risks about certain decisions that had to be made to complete the project. Throughout the relationship, including before any legal dispute, the Lawyers exchanged over a thousand emails back and forth to Vanir, advised it on the legal as well as the project management particulars of the casino expansion, and held multiple confidential meetings with Vanir without the Tribes. Based on these and other facts, the Lawyers repeatedly took the position that Vanir was the "functional equivalent" of a tribal employee such that all interactions were protected by the attorney-client privilege—a position the Lawyers have only now conveniently changed so that they can use confidential information obtained by Vanir's employees to sue Vanir.

Then a dispute arose between the Tribes and their general contractor, Ormond Builders, Inc. ("Ormond" or "OBI"). The Lawyers tapped Vanir to serve as the Tribes' representative in the dispute, asking that Vanir be seated at counsel's table. At the Lawyers request, Mr. Bacon amended the contract the Tribes had with Vanir to make the contract instead between the Lawyers and Vanir for the express purpose of cloaking all correspondence with Vanir as attorney-client. For months and months Vanir prepared the Lawyers for the OBI arbitration and literally lived with the Lawyers (staying in the same hotel, sharing all meals, etc.) during the multi-week arbitration.

Both before and after entering a joint defense agreement ("JDA"), Vanir engaged in confidential and entirely uninhibited communications with the Tribes through the Lawyers. Vanir gave them every confidential document requested without reservation because of the attorney-

client relationship the Lawyers lulled Vanir's employees into believing existed. Now, those same Lawyers are using that very same confidential information against Vanir in this litigation.

These are the same three Lawyers with whom Vanir shared thousands of emails with and commonly sought legal advice from. These are the same Lawyers who previously claimed that communications between Vanir and them were protected by the attorney-client privilege. These are the same Lawyers who Vanir reasonably believed it had an attorney-client relationship with. And one of these Lawyers' offices (Mr. Bacon's two-person Tribal Attorney's Office) is the only named party to the at-issue contract with Vanir.

These Lawyers continued involvement in this case presents a clear conflict, violates basic ethical norms, and violates the obligations Idaho and tribal attorneys owe to former clients, confidants, and the community at large—not to mention that these Lawyers are key fact witnesses. Vanir will be severely prejudiced if these Lawyers are allowed to continue representation in this litigation. Vanir respectfully requests that Messrs. Bacon, Echo Hawk, and Gabel (as well as their firms)[1] be disqualified from any continued involvement in this case.

## II. BACKGROUND

**A.    Vanir is hired by the Tribes.**

On July 14, 2015, the Tribes and Vanir executed an agreement (the "Contract") for Vanir to provide construction management services during the construction of a casino addition to the Shoshone-Bannock Hotel and Event Center in Fort Hall, Idaho ("Project"). Johnson Decl. ¶ 2, Ex. A. While negotiating the contract Vanir employee Scott Tomlinson worked closely with Messrs. Echo Hawk and Bacon to execute the Contract, including presenting the Contract to the Tribes'

---

[1] Pursuant to I.R.P.C. 1.10(a), "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule[] 1.7 or 1.9, unless" certain unapplicable exceptions apply. Therefore, the conflict noted herein are imputed to the Tribal Attorney's Office, Echo Hawk Law Office, and Lane Powell PC.

Business Council for approval. *Id.* ¶ 3. This close relationship with the Lawyers continued and deepened as the Project progressed.

**B.     The Lawyers receive insight and information into issues with TERO.**

Since the beginning of the Project there were issues between the Tribal Employment Rights Office ("TERO"), OBI, and the subcontractors. *Id.* ¶ 5.[2] Given the legal nature of the issues with TERO, Vanir requested that the Tribes provide legal advice related to communications from or with the TERO Commission. *Id.* The Tribes sent the request to Mark Echo Hawk,. *Id.*, Ex. B. From that point forward, PaulEcho Hawk regularly was regularly copied on any emails with Mark Echo Hawk. Paul Echo Hawk had visibility into the issues that OBI was facing with TERO that he would not have normally had insight into other than the relationship between Vanir and the Lawyers. *Id.* ¶ 6.

**C.     Dispute with OBI.**

On or around September 6, 2016, the Tribes hired OBI to serve as the general contractor on the Project. *Id.* ¶ 7. OBI began having issues performing under its contract. The original Substantial Completion date was March 28, 2018, but OBI fell woefully behind. *Id.* ¶ 8. Ormond revised the Substantial Completion date to September 25, 2018, putting the Project three months behind schedule. *Id.* The Tribes requested that OBI provide a recovery plan to get closer to schedule. *Id.* OBI refused. *Id.*

OBI had other issues as well, including quality control issues, inability to hire and maintain skilled workers, failure to provide required submittals, and other deficiencies. *Id.* ¶ 9. Given these and other issues, the Tribes began to evaluate whether they should continue to work with OBI. *Id.*

---

[2] To avoid the record being further tainted with the disclosure of confidential information, Vanir provides a general description of the confidential communications and documents shared between the Lawyers and Vanir. Vanir is willing to produce examples of such communications and documents for *in camera* review at request of the Court. Of the approximately 1,300 emails reviewed that Vanir exchanged with the Lawyers, at least 650 involved confidential communications or documents.

Ending the relationship with OBI would require terminating the contractual relationship between the Tribes and OBI, so the Tribes engaged counsel to advise on the risks of terminating the contract. *Id.* As part of that process and to assist the Lawyers with their legal analysis, Vanir prepared a substantial preliminary report that discussed, from a construction standpoint, the risks and costs associated with termination and other alternative paths. *Id.* Vanir had multiple conversations with the Lawyers about this analysis, and the Lawyers reviewed and revised Vanir's work product. *Id.*

In September 2017, the Tribes hired the law firm of Lane Powell PC ("Lane Powell"), specifically Seattle partner Mr. Gabel. Mr. Gabel assisted Vanir with evaluating a large change order that OBI had submitted, and he ultimately advised on whether the Tribes should continue to work with OBI. *Id.* ¶ 10. Mr. Tomlinson, a Vanir employee, led the efforts to hire Mr. Gabel. *Id.* ¶ 11, Ex. D. For example, Angelo Gonzales, the executive director of the Tribes, stated that he

> spoke with Scott Thomlinson [sic] about who should be the lead attorney in our Casino Project. He believes the correct process for the attorney situation going forward would be Paul E. to be the lead attorney. Mr. Andrew Gabel will assist Paul and do a lot of the preparation . . . . Mr. Gable, [sic] will consult attorneys' Bill Bacon, Paul Echo Hawk, Owner's Rep (Vanir) and Council to move forward . . . .

*Id.* Once Mr. Gabel and his firm were retained, Mr. Tomlinson scheduled and participated in the initial meeting with Mr. Gabel to explain the Project and the legal issues the Tribes were facing. *Id.* ¶ 10. Mr. Tomlinson attended the meeting with Mr. Gabel in person, while Messrs. Echo Hawk and Bacon conferenced it. *Id.* That is, Mr. Tomlinson—a Vanir employee—was the only non-lawyer, client representative to educate Mr. Gabel on the facts of the case and the legal services needed. As part of the relationship with Mr. Gabel, Lane Powel had direct access to Vanir's documents through Vanir's confidential and secure SharePoint system. *Id.* ¶ 12, Ex. E.

In March 2018, and at the request of the Lawyers, Vanir provided the Lawyers with a preliminary review and analysis of the risks and benefits associated with terminating Ormond for its failure to cure material breaches of the contract. *Id.* ¶ 13. Vanir attended a confidential meeting to provide the Lawyers with the details necessary to determine whether to issue a "cure or be terminated" letter, stay the current course with Ormand, or develop other alternatives. *Id.*

Even to an outside observer, it seemed as if the Lawyers were acting as counsel for Vanir. For example, counsel for OBI sent a cease-and-desist letter to Vanir and copied Messrs. Gabel and Echo Hawk because it was unclear whether they represented Vanir in the matter. *Id.* ¶ 14. Vanir sent the letter to the Lawyers and asked them for advice. *Id.*, Ex. F. The Lawyers, primarily Mr. Gabel, then responded to the cease-and-desist letter *on behalf of Vanir*. *Id.*, Ex. G.

**D.      The Tribes terminate the Contract with OBI.**

On April 3, 2018, the Tribes terminated its contract with OBI. OBI then filed three arbitration demands with the American Arbitration Association. In April 2019, the Tribes and OBI participated in an arbitration hearing over the design, construction, and contract administration of the Project. OBI alleged, among other things, that termination was wrongful and that the Tribes breached the contract. *Id.* ¶ 15, Ex. H, pp. 8–11; Ex. I, p. 3.

All the communications between Vanir and the Lawyers related to the arbitration demonstrate an attorney-client relationship. Mr. Bacon requested that Vanir "marshal the evidence in support of [the Tribes'] termination for default defense and claim against Ormind [sic]." *Id.* ¶ 16. Mr. Gabel allowed Vanir to review Ormond's "Attorney's Eyes Only" documents. *Id.* And nearly every email between Vanir and the Lawyers was marked with "Confidential Attorney Work Product." *Id.*

During the Ormond arbitration, the Tribes mounted their defense with Vanir's assistance so much so that the Tribes and Vanir entered a JDA in July 2018, even though, as demonstrated,

they had been routinely sharing confidential information back and forth for years before entering any agreement. *Id.* ¶ 17, Ex. J. At arbitration, the Lawyers asserted attorney-client privilege over their communications with Vanir's employees because, in the Lawyers' view, Vanir's employees were acting as the functional equivalent of a tribal employee. *Id.* ¶ 18, Ex. K. Vanir produced a significant volume of photographs and videos, which according to Mr. Gabel were "extremely valuable for the Tribes' case because it clearly documents Ormond's non-conforming work." *Id.* ¶ 19.

Moreover, Vanir played a critical role in the defense against OBI. On at least four occasions, Vanir prepared deposition questions for several critical witnesses as if it were the Lawyers' client assisting with deposition preparation. *Id.* ¶ 20. Mr. Tomlinson frequently organized confidential meetings to discuss various litigation efforts, including discovery, expert witnesses, and damages and costs analysis. *Id.* Similarly, Vanir prepared and provided damages calculations associated with OBI's breach of the contract. *Id.*

Vanir would frequently provide the first draft of work product to the Lawyers for their comments and redline. *Id.* ¶ 21. For even the most casual observer, Vanir appeared to be an involved client of the Lawyers—perhaps even more involved than the Tribes. Before the Lawyers or Vanir took any action, they would confer with one another.

E. **Amendment to the Contract.**

Under Amendment 8 to the Contract, which Mr. Bacon requested, the Contract was amended to change the named party in the contract from "Shoshone-Bannock Tribes" to the Shoshone Bannock Tribal Attorney's Office." *Id.* ¶ 22, Ex. L. The stated reason from the Lawyers for the requested change was to ensure that any communications between Vanir and the Lawyers were privileged. *Id.*

### F. This dispute.

Ultimately, the arbitration panel ruled for Ormond on three of the claims, finding that the Tribes wrongfully terminated their contract with Ormond. *Id.* ¶¶ 23, 15, Ex. I, p. 3. The Tribes then took a 180-degree spin and filed a complaint against Vanir alleging that (1) Vanir was negligent, (2) Vanir breached the Contract causing the Tribes to be "found liable to Ormond," and (3) Vanir is contractually required to indemnify the Tribes for the Ormond award. Dkt. 5. The same Lawyers that Vanir reported to and worked with for years are the exact same attorneys who—using the information they obtained from Vanir in confidence—are now suing Vanir for alleged issues relating to the performance under the Contract. *See id.* (listing Paul C. Echo Hawk of Echo Hawk Law Offices and Bill Bacon, General Counsel for the tribes as the counsel of record); Watkins Decl. ¶ 2, Ex. A (denoting an email from Mr. Gabel asking if counsel will accept service).

On May 2, 2021, Mr. Tomlinson passed away in an unfortunate accident. Johnson Decl. ¶ 28. As such, the only surviving witnesses to many of the key conversations and decisions at issue in this dispute are the Lawyers.

### III. LEGAL STANDARD

Disqualifying counsel is an exercise of the Court's inherent powers. *Andersen v. Valley Cnty*, No. 1:16-CV-00554-CWD, 2017 WL 2311668, at *3 (D. Idaho May 26, 2017). "State law governs motions to disqualify counsel." *Miesen v. Hawley Troxell Ennis & Hawley LLP*, No. 1:10-CV-00404-DCN, 2018 WL 1369909, at *3 (D. Idaho Mar. 16, 2018). ("[I]n deciding whether to disqualify counsel, the Court looks to the local rules regulating the conduct of the members of its bar." (quoting *Parkland Corp. v. Maxximum Co.*, 920 F. Supp. 1088, 1090 (D. Idaho 1996)).

The Lawyers must comply with the Shoshone-Bannock Tribal Bar Association Rules of Practice and the relevant state rules of professional conduct (Idaho's rules for Messrs. Bacon and Echo Hawk and Washington's rules for Mr. Gabel). Rule 11 of the Shoshone-Bannock Tribal Bar

Association Rules of Practice provides that "[a]ll persons practicing before Tribal Court shall: . . . 9. Keep all information confidential at all times relating to representation except so far as disclosure is required or permitted by the *Rules of Professional Conduct* or other law[.]" (Emphasis added.)

I.R.P.C. 1.9(a) states that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." The language in W.R.P.C. 1.9 is identical.

When deciding whether to disqualify counsel based on Rule 1.9, courts generally look for (1) the existence of an attorney-client relationship; (2) that the former representation was "the same or substantially related" to the current litigation; and (3) that the current client's interests are "materially adverse" to the former client's interests." *United States v. Lacey*, No. CR-18-00422-001-PHX-SPL, 2018 WL 4953275, at *3 (D. Ariz. Oct. 12, 2018) (quoting *Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. & Power Dist.*, 810 F. Supp. 2d 929, 944 (D. Ariz. 2011)).

Additionally, I.R.P.C. 3.7 provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." I.R.P.C. 3.7(a)(1)-(3). Washington has an identical rule. W.R.P.C. 3.7(a)(1)-(3).

### IV. ARGUMENT

**A.  The Lawyers must be disqualified under Rule 1.9 because they have a conflict of interest.**

The Lawyers in every meaningful way acted as legal counsel for Vanir during the Project and during the Ormond dispute, both before and after the Joint Defense Agreement was entered.

As a result, the Lawyers had unfettered access to Vanir's employees and documents. The Lawyers now seek to use that same information to sue Vanir. To allow the Lawyers to continue to represent the Tribes in this matter would significantly prejudice Vanir's ability to litigate this case. The Court should thus disqualify counsel from representing the Tribes in this matter and allow the Tribes an opportunity to retain replacement counsel.

1.  **There was a former attorney-client relationship between Vanir and the Lawyers.**

The Lawyers should be disqualified because there is a conflict of interest between them and Vanir. After Vanir and the Tribes executed the Contract for construction management services, Vanir worked closely with Messrs. Echo Hawk and Bacon—arguably even more closely than Messrs. Echo Hawk and Bacon worked with tribal employees. This close relationship with the Lawyers continued and deepened as the Project progressed, and the parties frequently communicated and shared confidential information and documents. The Lawyers provide legal advice directly to Vanir relating to various aspects of the Project. *See, e.g. Id.* ¶ 9.

Additionally, Vanir worked closely with the Tribes and the Lawyers to help in the arbitration with Ormond. During that arbitration, the Tribes opposed a motion to compel by asserting that communications between Vanir and the Tribes were privileged. *Id.* ¶ 18, Ex. K. In the Lawyers' own words:

> Given Vanir's intimate role representing the Tribes' interests, Vanir has also worked closely with the Tribes' counsel since immediately after becoming involved with the Project. **The Tribes' counsel could not provide adequate legal counsel to the Tribes without consulting Vanir.**

*Id.* In other words, the Lawyers asserted that Vanir was the functional equivalent of a tribal employee. *Id.* The attorney-client privilege extends to outside consultants who act as the functional equivalent of an employee, like the Lawyers said Vanir did for the Tribes. *United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010).

Here, Vanir was involved on a daily basis with the Tribes in the Project that serves as the basis for this litigation. Thus, Vanir personnel were "precisely" the sort of people with whom the Lawyers "wish[ed] to confer confidentially." Johnson Decl. ¶ 18, Ex. K, p. 8. Indeed, they did. The Lawyers and Vanir exchanged thousands of emails and exchanged a significant number of documents. *Id.* ¶ 25. These email communications often did not include the Tribes, just Vanir and the Lawyers—suggesting the Lawyers viewed Vanir as its client, otherwise the communications would not be privileged. *Id.* Vanir frequently requested and received legal advice from the Lawyers regarding the Project. *Id.* ¶¶ 5, Ex. B, 14, Exs. F, G. Moreover, according to invoices made by Lane Powell (Mr. Gabel's firm), the Tribes frequently worked with Vanir to prepare for depositions, exchange legal advice, and generally prepare for the arbitration. *Id.* ¶ 26, Ex. M.

Further, the Lawyers amended the Contract to include the Tribal Attorney's Office as the named party to the Contract. *Id.* ¶ 22, Ex. L. According to the Lawyers, they did so because they wanted to be able to protect any communication between the Tribes and Vanir as privileged. *Id.* The Lawyers' own actions—and their prior briefing—demonstrate that they created a *de facto* attorney-client relationship. But now that the Lawyers lost at the OBI arbitration, they contradict their prior position so that they can save face by pinning the blame on Vanir in this lawsuit, using confidential information that Vanir shared with the Lawyers.

> **2. Even if there was not an official attorney-client relationship, confidential information was exchanged such that a conflict of interest was created.**

The Tribes and Vanir entered a JDA, which said that no party shall "utilize any such Joint Privilege Materials as evidence in any present or future legal or other adjudicative proceeding between the Parties." Johnson Decl. ¶ 17, Ex. J. Pursuant to that agreement (as well as the ongoing relationship between the Lawyers and Vanir), Vanir provided confidential documents and information in meetings to the same attorneys who now bring these claims against Vanir. *Id.*

"[A] conflict of interest may be created when, as here, an attorney [the Lawyers] has acquired confidential information about a non-client [Vanir] in connection with his representation of a client [the Tribes], such as when an attorney obtains confidential information about a co-defendant of a client during a joint defense of an action." *All Am. Semiconductor, Inc. v. Hynix Semiconductor, Inc.*, No. C 07-1200 et al., 2008 WL 5484552, at *6 (N.D. Cal. Dec. 18, 2008), *order clarified*, No. C 07-1200 PJH, 2009 WL 292536 (N.D. Cal. Feb. 5, 2009). Whether or not Vanir and the Lawyers have a formal attorney-client relationship is not determinative because "an attorney's receipt of confidential information from a non-client may lead to the attorney's disqualification." *Id.* at * 4 (quoting *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223, 232–33, 81 Cal. Rptr. 2d 425 (1999)).

Furthermore, a JDA can create a disqualifying conflict where information gained in confidence by an attorney becomes an issue. *Id.* In *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000), the court cited with approval *Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977), which stated:

> Just as an attorney would not be allowed to proceed against his former client in a cause of action substantially related to the matters in which he previously represented that client, an attorney should also not be allowed to proceed against a co-defendant of a former client wherein the subject matter of the present controversy is substantially related to the matters in which the attorney was previously involved, and wherein confidential exchanges of information took place between the various co-defendants in preparation of a joint defense.

Likewise, the Ninth Circuit has long recognized that the joint defense privilege is "an extension of the attorney-client privilege," and joint defense agreements allow parties with cohesive interests to share information without waiving confidentiality. *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (quoting *Henke*, 222 F.3d at 637).

Here, it is indisputable that the Lawyers received confidential information from Vanir that is material to the Tribes' claims in the current dispute. The Tribes characterized the relationship as "symbiotic." Johnson Decl. ¶ 18, Ex. K.

Using the Lawyers' own words,

> Given Vanir's intimate role representing the Tribes' interests, Vanir has also worked closely with the Tribes' counsel since immediately after becoming involved with the Project. The Tribes' counsel could not provide adequate legal counsel to the Tribes without consulting Vanir. . . . As evidenced by the Tribes' privilege log, the Tribes' attorneys often consulted Vanir personnel—sometimes without simultaneously consulting the Tribes themselves—in order to fully apprise themselves of the facts relevant to a particular issue or determination.

*Id.* at 4.

The Lawyers and Vanir exchanged thousands of emails and documents. *Id.* ¶ 25. These emails often involved confidential communications and legal advice. *Id.* ¶¶ 5, 10, 12, 14, 16-18, 20-22. They were frequently marked with "confidential," "attorney-client privilege," "work product," or some combination of those designations. *Id.* ¶ 16. The receipt of this confidential information, in and of itself, should preclude the Lawyers' involvement in this case. To hold otherwise would greatly prejudice Vanir.

   **3. The Lawyers' representation involves the "the same or substantially related matter" to the current litigation.**

The matter to which counsel previously represented Vanir is the exact same as the current litigation. The previous matter involved disputes over the casino expansion project for which Vanir provided construction management services. Particularly, Vanir provided and assisted in the defense of the claims made by OBI. After the arbitrators found in favor of OBI—that is, after the arbitration panel found that the Lawyers wrongly advised the Tribes that they could terminate the underlying contract for cause—the Tribes, through the Lawyers, decided to take the loss out on Vanir by alleging that Vanir acted negligently and breached the Contract, resulting in the damages

paid in the OBI arbitration. The dispute involves the *exact matter* to which the Lawyers provided legal advice and to which Vanir provided confidential information. Additionally, as noted above, the Tribal Attorneys' Office is the only party opposite Vanir to the Contract, and this is a breach of contract case. The representation involves the same matter.

4. **The Tribes' interests are "materially adverse" to Vanir's interests.**

This element is also indisputable. Vanir's and the Tribes' interests are materially adverse to one another. The Tribes are suing Vanir to recover alleged damages. The Lawyers could use the confidential information and communications shared in the previous matter against Vanir in an attempt to prove that Vanir was somehow responsible for its loss in arbitration.

**B.     The Lawyers are violating the JDA.**

In the summer of 2018, the Tribes and Vanir entered into the JDA. Johnson Decl. ¶ 17, Ex. J. Pursuant to the JDA, the Tribes and Vanir agreed that no party shall "utilize any such Joint Privilege Materials as evidence in any present or future legal or other adjudicative proceeding between the parties." *Id.* Pursuant to that agreement, Vanir provided confidential information to the same lawyers who now bring claims against Vanir. *Id.* ¶¶ 17-18.

Vanir shared huge amounts of confidential information including purported damages calculations, photographs and videos of the Project, information concerning design and constructability of the Project, and overall discussions regarding OBI's breach of contract and various deficiencies. *Id.* ¶¶ 5, 10, 12, 14, 16-22.

This information is directly relevant to the claims asserted against Vanir. The Tribes allege that Vanir was somehow negligent in its management of the Project. The claims directly relate to Vanir's involvement with OBI and conduct as "Owner Representative." All of these claims directly relate to the Project, which is the exact content and subject matter of all of the communications and documents provided under the JDA.

The Lawyers have violated and continue to violate the JDA as long as they continue to represent the Tribes. Any confidential information received from Vanir is expressly protected from use in a future proceeding between the parties. In other words, under the JDA, the Lawyers cannot use any information that was provided by Vanir. Even if the Lawyers destroyed the confidential documents that they received, they cannot unlearn what was in those documents or what they discussed in their frequent calls and meetings with Vanir's employees. The playing field will never be equal, as the Lawyers unfairly know exactly what to ask and where to look in "discovery" to find confidential information. The Lawyers' continued involvement in this case will cause the Tribes to be in continuous and persistent breach of the JDA.

While the JDA does not foreclose the ability for the parties to bring claims against one another, it *does* prevent the use of any disclosed material, including communications, from being used as evidence in a subsequent proceeding. The Lawyers cannot unlearn what they have already learned in confidence from Vanir. The JDA requires that the parties enter any litigation on equal footing without the advantages associated with the information shared. Here, that is not possible if the Lawyers are allowed to represent the Tribes in this case. The Tribes are free to maintain their suit against Vanir under the JDA, just not with these Lawyers.

C.  **The Lawyers are fact witnesses and therefore cannot serve as counsel.**

Because the Lawyers are necessary fact witnesses, they cannot serve as an advocate for the Tribes. Rule 3.7 provides that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." I.R.P.C. 3.7(a)(1)-(3); W.R.P.C. 37(a)(1)-(3).

The purpose of the rule is to prevent the trier of fact from being confused or misled by a lawyer serving as both advocate and witness. I.R.P.C. 3.7 cmt. 1. Therefore, the opposing party has a proper objection where the combination of roles may prejudice that party's rights in the litigation. *Id.* cmt. 2. "Another rationale commonly advanced for the rule focuses on the appearance of impropriety that may be created when a lawyer testifies on behalf of his client." *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1311 (5th Cir. 1995).

While the Rule specifically prohibits an attorney acting as an advocate "at trial," it is unworkable and, frankly, unseemly, to think that all three Lawyers would be subject to third-party subpoenas and document demands and be required to sit for depositions, while working the case up for trial. But that is the current situation based on the Lawyers' roles as key fact witnesses. Will each represent the other at their depositions? Will they function *pro se* on their own behalf if their own discovery responses prove deficient? There is no need for the Court to wait for such a comedy of errors to play out until the eve of trial. Here, there is sufficient basis to disqualify the Lawyers from acting as counsel now.

First, the Lawyers are necessary witnesses. The Lawyers would be expected to testify regarding Vanir's actions during the Project. According to the Lawyers, "Vanir acted as the on-site construction manager, reviewed Ormond's submittals, coordinated the resolution of non-compliant or deficient work, drafted Project-related correspondence for the Tribes, and trained the Tribes' personnel where necessary. Put simply, Vanir acted as the Tribes' mouthpiece during the Project." Johnson Decl. ¶ 18, Ex. K at 3. Vanir supplied all of that information to the Lawyers. Thus, the Lawyers have significant factual knowledge regarding Vanir's performance under the Contract—the very Contract that the Lawyers now argue Vanir breached.

Vanir also communicated regarding all of the issues that resulted from OBI's work on the contract including quality control issues, inability to hire and maintain skilled workers, failure to provide required submittals, and other deficiencies. *Id.* ¶ 9. These deficiencies led to the arbitration with OBI where Vanir supplied communications and documentation to the Lawyers that was "extremely valuable" to the Tribes. *Id.* ¶ 19. Vanir provided written work product that detailed the damages associated with the case and the strategy for defending against OBI's claims. *Id.* ¶ 20.

Finally, the email communications frequently involved Mr. Tomlinson. Mr. Tomlinson passed away in 2021. *Id.* ¶ 28. Accordingly, the Lawyers are some of the few remaining witnesses to the key issues in the dispute. Their knowledge about the case is critical to this litigation and concerns the primary aspects of the case. Thus, their testimony is material, relevant, and necessary.

As a necessary witness for Vanir, the Lawyers must be disqualified from acting as an advocate in this litigation because the exceptions listed in Rule 3.7 do not apply. First, their testimony would concern contested issues. I.R.P.C. 3.7(a)(1). As described above, there are various disputed issues concerning Vanir's performance under the Contract and whether or not Vanir acted negligently. Second, the testimony would not be limited to the "nature and value of legal services rendered." I.R.P.C. 3.7(a)(2). Rather, the testimony concerns discussions of Vanir's services as provided under the Contract. These topics are outside of the scope contemplated in Rule 3.7(a)(2). Finally, disqualification would not create a substantial hardship for the Tribes. The case is in an early posture. The Tribes have sufficient time to find replacement counsel.

## V. CONCLUSION

Under any reasonable reading of the Rules, the Lawyers must be disqualified. Either there was an attorney-client relationship between the Lawyers and Vanir—complete with privileged communications—such that the Lawyers cannot now act adverse against Vanir; or the Lawyers gained confidential information from Vanir during their representation of the Tribes, by means of

the JDA or otherwise, such that they cannot now use that confidential information against Vanir; or there was never any attorney-client relationship, meaning all of the Lawyer/Vanir communications are subject to discovery, and the Lawyers are key fact witnesses. Either way, the Lawyers must be disqualified.

For the reasons stated herein, Vanir respectfully requests that the Lawyers be disqualified from representing the Tribe in this matter and that the Tribes be allowed a sufficient opportunity to retain replacement counsel.

DATED: April 14, 2023.  */s/ Elijah M. Watkins*
Elijah M. Watkins

*Attorneys for Defendant*

MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY COUNSEL - 18
119141860.10 0076321-00001

**CERTIFICATE OF SERVICE**

      I hereby certify that on April 14, 2023, I served a copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY COUNSEL** on CM/ECF Registered Participants as reflected on the Notice of Electronic Filing as follows:

    *paul@echohawklaw.com*

                                     */s/ Elijah M. Watkins*
                                     Elijah M. Watkins