# Exhibit I

Exhibit I

# AMERICAN ARBITRATION ASSOCIATION

## CONSTRUCTION INDUSTRY ARBITRATION RULES

| | |
|---|---|
| **In the Matter of the Arbitration Between:**<br><br>**ORMOND BUILDERS, INC.**, an Idaho corporation,<br><br>                  Claimant,<br><br>    v.<br><br>**SHOSHONE-BANNOCK TRIBES**, Native American Tribes; and **TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA**, a Connecticut corporation,<br><br>                  Respondents. | Consolidated Case Nos.<br>  01 17 0005 4109<br>  01 18 0000 3461<br>  01 18 0001 3428<br><br>**INTERIM AWARD** |

## I.  INTRODUCTION

This is a dispute between Ormond Builders, Inc. ("OBI") and Shoshone-Bannock Tribes ("SBT") arising out of an agreement ("Contract") (Ex. 88) between OBI and SBT for the construction of a casino expansion in Fort Hall, Idaho ("Project").[1]

We, the undersigned Arbitrators, having been designated in accordance with the Arbitration Agreement entered into between the parties, and having been duly sworn, and having duly reviewed the evidence and argument of the parties, do hereby issue this Interim Award as follows:

---

[1] Travelers Casualty and Surety Company of America ("Travelers") is also a party. However, by Order No. 15, dated March 25, 2019, all issues relating to it were stayed.

## II.  BACKGROUND

The Project involves the design and construction of an approximately 72,000-square-foot casino with structural steel framing and concrete foundation.  The architect for SBT was FFKR Architects ("FFKR") and the construction manager for SBT was Vanir Construction Management ("VCM") (Exs. 27, 45).  Travelers posted a performance bond on behalf of OBI.

The Project was bid as a design, bid and build project, on July 8, 2016.  There were five bidders.  OBI was not the low bidder.  However, after SBT selected three additive alternates out of the five alternates on the bid schedule, OBI was the low bidder at $35,984,051.  The Contract was signed on September 6, 2016.  The Notice to Proceed was issued on October 5, 2016.  The initial substantial completion date was March 28, 2018.

Almost immediately, disputes arose between SBT and OBI relating to staffing, scheduling, submittals, preconstruction conferences, quality of work, stop work orders, Tribal Employments Rights Ordinance ("TERO") issues, design issues, changes, delays and requests for additional time and compensation.

Ultimately, SBT sent OBI a 30-day Notice of Default on March 9, 2018 (Ex. 133), requesting a cure from OBI and its surety, Travelers.  On March 28, 2018, OBI filed a detailed response to the Notice of Default and a request for a cure (Ex. 1787).  On April 3, 2018, SBT terminated the Contract for cause (Ex. 142).

On April 23, 2018, Travelers notified SBT that it would, subject to a reservation of rights, complete the Project under the performance bond with Vertex (Ex. 2008).  SBT rejected the offer of Travelers (Ex. 1819) and contracted with Big-D, another contractor, to

complete the Project (Ex. 1819). The Project is essentially complete, but not completely closed out.

### III. CLAIMS OF THE PARTIES

The parties initiated three separate arbitration proceedings arising out of the Project. The pleadings included: Case No. 01-17-0005-4109 (L900): OBI's First Amended Statement of Claims (4/18/18) and SBT's Answering Statement (9/22/17); Case No. 01-18-0000-3461 (SFRM): OBI's First Amended Statement of Claims (5/22/18) and SBT's Answering Statement (2/5/18); and Case No. 01-18-0001-3428 (Wrongful Declaration of Default): OBI's Demand for Arbitration (3/30/18), SBT's Answering Statement and Counterclaim (4/18/18), and Travelers' Answering Statement (4/30/18).

By Order dated June 7, 2018, the three proceedings were consolidated. The pleadings in the consolidated matter included OBI's Restated Statement of Claims (1/18/19), Travelers' Answering Statement and Cross-Claim (1/18/19), OBI's Reply to SBT's Counterclaim (1/18/19), and SBT's Response to Travelers' Cross-Claim (2/1/19).

OBI generally alleges, in its First Claim for Relief, a request for declaratory judgment that the termination of default was wrongful; in its Second Claim for Relief, that SBT breached the Contract; in its Third Claim for Relief, that SBT breached certain implied warranties; in its Fourth Claim for Relief, that SBT breached the covenant of good faith and fair dealing; and in its Fifth Claim for Relief, requests recovery in quantum meruit, and seeks damages on all claims.

SBT generally alleges that OBI breached the Contract, was negligent in performance, and breached the duty of good faith and fair dealing, and that the termination for cause was

proper, and seeks damages for the cost of completion, including repair of defective and incomplete work and liquidated damages.

Each party claims attorneys' fees and costs.

The hearing commenced on April 1, 2019, and continued through April 5, 2019, April 8 through April 13, 2019, April 15 through April 19, 2019, and April 22 and April 23, 2019.

OBI was represented by Thomas A. Larkin and Jesse C. Ormond of Stewart Sokol & Larkin LLC, and Frederick J. Hahn III, John A. Bailey and Pamela Miller of Hawley Troxell Ennis Hawley LLP.  Respondent SBT was represented by Andrew J. Gabel and Angie R. Nolet of Lane Powell PC, Paul C. Echo Hawk of Echo Hawk Law Office and Bill Bacon, General Counsel for SBT.  Travelers was represented by Edward Rubacha of Jennings Haug Cunningham for part of the proceedings.

The following witnesses were sworn in and testified:  for the Claimant, Don Acord, Wyatt Aikin, Nicholas Contos, Connie Davis, Ted Davis, Boyd Erickson, Michael Gregory, Bart Brover, Paul Harmon, Lamar Hayward, Don Irwin, Daniel Lamczyk, Lenora Lavatta, Lance Linsenmann, Bill McConnell, Gary Moorhead, Murry Mullenax, David Neagley, Kevin Oakey, Don Ormond, Jack Ormond, Carlos Serpa, Richard Sieracki, Gray Slocum, Arden Smith, Steven Sunich, Terry Swallows, Richard Tasker, Darren Truchot, Justin Veilleux, Fred Wallin and Jon Wisby, and, for Respondent, Mark Echo Hawk, Marlin Fellows, Charis Hofheins, Mark Johnson, Mike Leishman, Linda McGowen, Drew Morgan, Nathan Small, Scott Tomlinson, Vanessa Williams and Mike Woodward.

Exhibits by both parties were offered and received into evidence. The proceedings were transcribed.

Closing argument occurred on April 23, 2019, and proposed Findings of Fact and Conclusions of Law were submitted by counsel on April 29, 2019.

The hearing was closed on May 8, 2019.

The parties requested a reasoned award with some findings of fact and conclusions of law. As a result, while there is substantial testimony and many Exhibits to support this Interim Award, the testimony and Exhibits referenced are listed only as examples.

## IV. INTRODUCTION AND CONTEXT

This Project was complex and, like most projects, would have been challenging to complete even in the best of circumstances. However, there were several factors that occurred on this Project even before the Contract was executed that made it even more challenging for the parties to successfully complete. These factors are described in more detail herein but included the withdrawal by the initial architect and contractor for the Project, problems with TERO, OBI's limited experience with TERO, SBT budget issues and the need to complete the revenue producing Project as soon as possible, issues with the design and the decision by SBT to not address the design deficiencies identified in the constructability review and back check of that review prior to the execution of the Contract.

## V. THE MAJOR ISSUES, FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Termination for Default Issue

The threshold issue in the dispute is whether the termination of the Contract for cause by SBT was justified or wrongful.

A termination for cause of a construction contract is the "death penalty" in terms of

remedies for a dispute on a construction project.  It is so called because the consequences of a

termination for cause can be lethal to one of the parties—and sometimes both.  As a result, it

is important to take into account the law governing termination of construction contracts.

> The most highly leveraged decision in construction, bar
> none, is the decision to declare the contract terminated due to a
> material breach by the other party.  An owner's wrong decision
> to terminate the contract discharges both the contractor and its
> performance bond surety from all performance obligations, and
> exposes the owner to liability to the contractor for lost profits
> and other damages due to wrongful breach and even for
> extracontractual damages where the termination decision is
> found not only to have been wrongful but made in bad faith.
> An owner's wrong decision not to terminate, whether reached
> in trepidation of the consequences of a wrongful termination or
> in confusion over the occurrence of a material breach, can
> leave the owner with a project untimely completed or of
> unsatisfactory quality or both, and with recourse limited to the
> contractor and not to the performance bond surety.  A
> contractor's wrong decision to abandon the work results in
> liability to the owner for completion costs and other
> foreseeable damages resulting from delayed project
> completion, and frequently also results in loss of client
> relationships, intangible damage to reputation, and exposure to
> possible bad faith extracontractual damages.

5 Philip L. Bruner & Patrick J. O'Connor, Jr., § 18.3, Westlaw (database updated June 2018)

(footnotes omitted).

> What makes the termination decision so highly
> leveraged for both parties is that a wrongful termination of a
> contract is itself the paramount material breach.  The economic
> risk that a termination decision subsequently may be judged
> wrongful is magnified considerably by the (1) subjective
> unilateral "self help" nature of the remedy; (2) lack of a clear
> legal standard for determining whether a construction contract
> breach is material or immaterial; (3) factual complexity of the
> construction process resulting in an increased likelihood that
> both parties may be found guilty of some kind of breach of
> contract; (4) need to determine which party is guilty of the first
> uncured material breach; (5) judicial disfavor of termination as
> a draconian and drastic remedy, constituting a species of
> forfeiture warranting strict judicial construction and
> enforcement of the breaching party's pretermination rights to

notice and an opportunity to cure breaches deemed sufficiently material to warrant contract termination by the nonbreaching party; (6) differing judicial views of the evidentiary proof of material breach; (7) likelihood that the multitude of interdependent subcontractors and suppliers will be damaged by the wrongful termination decision, thus compounding the economic impact of the risk; and (8) stark reality that rarely can a wrong decision be reversed and only infrequently can judicial second-guessing in subsequent proceedings be avoided.

*Id.* (footnotes omitted).

> The significant consequences of a wrongful termination dictate care in assuring compliance with proper termination procedures. Termination of a construction contract can be upheld only if the terminating party sustains its burden of proof that (1) the contractor materially breached its contract, based upon an evaluation of the circumstances under the doctrines of substantial performance, economic waste, excusability, waiver, cure, mitigation, impracticability . . .; (2) the material breach was not induced preceded, or otherwise excused by the terminating party's own supervening material breaches of contract . . .; (4) the breaching party . . . w[as] given adequate notice of and an opportunity to cure deficiencies deemed sufficiently material to warrant termination; [and] (5) the terminating party terminated the contract in strict compliance with contractually specified termination procedures . . . .

*Id.* § 18.39 (footnotes omitted).

The authorities make it clear that the circumstances surrounding the termination for cause must be carefully considered. In this case, the parties each claim substantial failures of performance by the other party leading up to the termination and rely on certain testimony and multiple Exhibits to support their respective positions on the issue of termination.

OBI, in claiming that the termination was wrongful, alleges generally, among other things, that SBT:

1.      Failed to disclose that a constructability review or a back check existed relating to the reviews, which review revealed serious defects in the design;

2.     Provided a defective design resulting in an excessive number of RFIs, ASIs, CCPs and change orders;

3.     Sought to make OBI responsible for certain design obligations of FFKR;

4.     Through Mr. Edmo, SBT's TERO representative, interfered with the work and failed to comply with TERO's contractual requirements;

5.     Failed to grant extensions of time and process change orders for both time and additional compensation in accordance with the Contract;

6.     Otherwise failed to properly administer the Contract;

7.     Entered into a cost-plus contract with Big-D without regard to mitigating damages; and

8.     Breached its obligations to Travelers by not allowing it to complete its investigation and contract with Vertex to complete the Project resulting in excusing OBI from any failures of performance.

SBT, in supporting its termination for cause, alleges generally, among other things, that OBI:

1.     Failed to prosecute the work diligently;

2.     Performed defective work;

3.     Failed to have an adequate quality control plan, and, in particular, failed to comply with Section 1.8 of 014000 of the Specifications;

4.     Failed to adequately staff the Project;

5.     Failed to provide contractually required submittals; and

6.     Failed to cooperate and refused to follow SBT direction, including, without limitation, providing a cure to the deficiencies identified by SBT in its letter of March 9, 2019.

SBT has the burden of proof to establish that its termination for cause was proper. *Krygoski Constr. Co. v. United States*, 94 F.3d 1537 (Fed. Cir. 1996); *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987). Relatively minor and technical violations of a contract are generally insufficient to justify a termination for cause. *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424 (Ct. Cl. 1969).

After reviewing the evidence, the Panel finds that SBT did not meet its burden of proof that the termination was justified.

1.     The original architect on the Project terminated its contract with SBT during the design process due to significant concerns with Mr. Edmo, SBT's TERO administrator.

2.     The initial contractor for this Project, expressing similar concerns relating to TERO, also declined to continue with the Project.

3.     SBT, in issuing the plans and specifications, represented to OBI that the design was accurate, complete and sufficient to construct the work. *United States v. Spearin*, 248 U.S. 132 (1918). They were not. Instead, VCM performed a constructability review on the plans and specifications and noted more than 1,300 design issues (Exs. 27, 56, 63, 65, and 66). VCM then performed a back check to determine whether the issues it had flagged had been addressed. Approximately half of the issues had not been addressed and a significant number of them were classified as significant (Exs. 78, 81, 83-85). Nonetheless, because SBT was losing money on the hotel and needed the casino operational as soon as possible, it

proceeded with the bid process rather than correct the plans and specifications. (Leishman, Ormond, Fellows, Tomlinson and Neagley testimony.)

4.    SBT had an implied obligation to cooperate with and not to hinder the performance of OBI. *SIPCO Servs. & Marine Inc. v. United States*, 41 Fed. Cl. 196 (Fed. Cl. 1998); *WRB Corp. v. United States*, 183 Ct. Cl. 409 (1968). Instead, Mr. Edmo, chair of the TERO commission, failed to properly administer and resolve issues during a substantial part of the Project with respect to TERO. This failure hampered OBI and its subcontractors' ability to prosecute the work. (D. Ormond and J. Ormond testimony.)

5.    SBT had an express obligation under the Contract to timely respond to RFIs and CCPs and to adhere to the Contract requirements (Ex. 88 ¶ 10.18.3); *Specialty Assembly & Packing Co. v. United States*, 174 Ct. Cl. 153 (1966). It did not. Many RFIs and CCPs were not responded to in a timely fashion and important design issues went unaddressed for months. (Irwin testimony.)

6.    SBT had an implied obligation to disclose to the bidders any information material to the performance of the Contract. *Giesler v. United States*, 232 F.3d 864 (Fed. Cir. 2000). SBT failed to disclose material information to the bidders (Ormond, Contos and Fellows testimony).

7.    Illustrative of the seriousness of the design issues, Mr. Ridgeway, the initial site representative for VCM, even suggested the entire constructability review be issued as an addendum to the building documents (Ormond, Contos and Fellows testimony).

8.    OBI's low bid was approximately 50% higher than SBT's budget for the Project (Fellows testimony).

9. In addition, SBT exercised additional alternates that increased OBI's contract amount by almost $4,000,000.

10. Mr. Ridgeway was replaced by Mr. Johnson early in the Project and Mr. Johnson had more of a forensic construction background than that of an Owner's representative.

11. Some, but not all, of the design issues that were raised by OBI included the L900 Custom Light Fixtures, the river soffit, the MEP hanger system and the building envelope (Exs. 82, 100, 1969 and 1970).

12. While OBI, in some respects, failed to strictly adhere to the requirements of the Contract with respect to submitting a Project schedule and quality control plan, conducting pre-installation meetings and preparing and processing submittals, such failures were not material in the context of the design, contract administration and the TERO issues encountered by OBI and the decision by SBT to terminate the Contract for cause. *See, e.g., J.D. Hedin Constr.*, 408 F.2d 424.

13. Regarding the allegation that OBI failed to prosecute the work diligently, the evidence established that the vast majority of the work was being performed by subcontractors and those subcontractors were adequately prosecuting the work except in areas in which they were waiting on design clarification, such as the exterior cladding system.

14. There was evidence that, in certain instances, OBI's subcontractors performed defective work. Some amount of defective work is inevitable in any construction project given that the work is performed by human beings who are not perfect. In most instances,

upon discovery of the defective work, OBI or its subcontractors corrected it. Examples of that correction included the undersized fasteners at the porte cochere, the fireproofing, and the paving anomalies. In other cases where defective work remained uncured, such as the building envelope and the river soffit, those defects were caused in large part by defective design and SBT did not timely provide corrected design details to allow OBI and its subcontractors to complete those areas of work.

15. OBI did not have an appropriate formal quality control plan until late in the Project. That being said, there was no proof that this failure to have an adequate written plan resulted in a lack of quality performance. Multiple OBI witnesses testified that quality control was significant to each member of the construction team. It is also notable that neither of SBT's own consultants, FFKR and VCM, had quality control plans. Accordingly, this breach, to the extent it occurred, was not material.

16. There was insufficient proof that OBI failed to adequately staff the Project or that staffing issues materially impacted the Project. OBI witnesses testified that OBI had successfully completed similar projects (as to both size and complexity) with the management team and approach used on the Project, that when it appeared that the Project was in distress, Mr. Ormond ceased activities on other projects, devoted himself full time to the Project and instructed his staff to stop bidding other work so all of OBI management could concentrate on prosecution of the work. Given the proportion of work accomplished by subcontractors, OBI's staffing of the Project was not a material factor in the prosecution of the work.

17.     The evidence supports the finding and conclusion that OBI generally provided both timely and complete submittals, and work that was subsequently rejected had in fact been supported by submittals that had been approved by the design team.  The submittals for the MEP hanger system, certain roof joists, and the building envelope needed to be modified; in most instances those modifications required design changes and clarifications by FFKR, such that they were not the proximate cause of the shortcomings in those systems, and certainly not because no submittal had been made.  Regarding the river soffit, no submittal had been made as to its construction, but it is not clear that a submittal was required.  Instead, the method that OBI used to temporarily install the soffit was a means and methods decision left to OBI.  It was red-tagged without any structural analysis as to whether it was safe in that condition, and ultimately the support system was completely redesigned.

18.     Regarding the allegation that OBI failed to cooperate and refused to follow SBT direction, there is no dispute that the relationship between OBI and SBT began to deteriorate almost immediately after the Notice to Proceed.  This was due at the outset to the manner in which the TERO commission, notably Mr. Edmo, treated both OBI and its subcontractors.  Mr. Edmo acted in an adversarial manner and it was clear from the evidence that he intended to make OBI's performance as challenging as possible.  The parties also disagreed on the monetary value for changes to the work and could not agree on whether time extensions were justified and, if so, how much time should be granted.  Both parties produced evidence of the failure of the other to cooperate:  SBT did not follow the Contract procedures regarding change orders, using, for example, ASIs for significant changes to the work rather than using change orders, and SBT consistently failed to timely evaluate and

102208015.4 0010730-00431

grant time extensions for discrete changed work items as the work progressed. Instead, it insisted on utilizing a "block of time" approach to time extensions, which was not provided for in the Contract and which did not allow OBI to effectively schedule its work. SBT also did not respond to some correspondence from OBI, and at other times simply ignored its requests for Contract modifications. OBI's ultimate failure to do as requested by SBT has to be evaluated in light of this toxic relationship. Probably the biggest failure on the part of OBI was in failing to generate a recovery plan when requested by SBT. However, the evidence established that OBI could not generate a reliable or even useful recovery plan because OBI had been waiting for significant periods of time for responses to its RFIs and other requests for direction as to the work. Without reliable information (or any information) as to when design changes would be made, there was no realistic way for OBI to generate a meaningful recovery schedule, so it refused. While in hindsight it may have been more politic to simply comply and create an artificial and meaningless recovery schedule, this failure to follow instruction would have no material impact on the actual progress of the job.[2]

19.     At the time of termination of the Contract and at all times prior thereto, OBI was entitled to additional compensation and extensions of time beyond what was provided by SBT in CCPs 24 and 58 (Ex. 1805).

---

[2] "All parties typically benefit if the contractor is kept on the job and deficiencies and problems are corrected. In construction contracting, technical immaterial breaches are endemic to construction process and routinely are resolved by cure, negotiation, waiver or acceptance. As a practical matter, however, any breach more likely will be perceived by a party as material following an irretrievable breakdown in the contractual relationship that causes one or both parties to lose confidence in and assurance of future satisfactory performance. At that point, the parties invariably magnify both the materiality of breaches and the perception that performance will be better in the future than past, and, ostensibly to mitigate damages, opt to terminate the contract." Bruner & O'Connor, *supra*, § 18.5 (footnotes omitted).

102208015.4 0010730-00431

20.     OBI requested time and compensation for TERO issues and none was provided (Exs. 158, 308, 703C, 704C, 706B and 707B).

21.     There were material changes acknowledged by SBT to the plans and specifications entitling Big-D to additional time and compensation after the termination for default.  OBI would have been entitled to the same had it not been terminated.

22.     The contractual basis utilized by SBT with Big-D was not unreasonable given its alternatives at the time and available contractors.

23.     There was no "cardinal change" of the Contract.  *Becho Inc. v. United States*, 47 Fed. Cl. 595 (2000).

## B.     The Bad Faith Issue

The Panel, having found that the termination for default was improper, then turns to the next major issue to consider which is whether the wrongful termination was in bad faith.

This is important because, ordinarily, if a construction contract is wrongfully terminated, the contractor may claim damages including lost profits.  In this case, Paragraph 9.01(G) of the Contract provides that, in the event of a wrongful termination, the termination is considered to be a termination for convenience.  Under the terms of the Contract, if its Contract is terminated for convenience, OBI is limited under Paragraph 9.02(C) to its reasonable direct costs incurred prior to the effective date of termination, plus a reasonable markup for overhead and profit and reasonable administrative costs.  The provision expressly bars OBI from claiming any other damages, including lost profits.  *John Reiner & Co. v. United States*, 325 F.2d 438 (Ct. Cl. 1963).

In an effort to avoid the limitations under Paragraph 9.02(C), OBI alleges that the termination was in bad faith and, as a result, its damage claims are not limited by the Contract and it may claim lost profits, other direct costs and amounts it may owe to Travelers.  It alleges generally there was a coordinated effort almost from the outset of the Project by SBT, FFKR and VCM to "set up" OBI to fail on the Project and relies upon the following to establish that SBT acted in bad faith:

1.      There was no justification for the decision to terminate the Contract for cause;

2.      The failure to advise OBI of the results of the constructability review and backcheck.

3.      There was an effort by FFKR, VCM and SBT to transfer the design obligations of FFKR to OBI when all three parties knew from the constructability review that the design was flawed and incomplete, corrections had not been made to many of the items and the plans and specifications were released to OBI without disclosure of the known deficiencies;

4.      The failure by SBT and VCM to properly administer the Contract with respect to OBI's claims for additional time and compensation;

5.      The decision by VCM to prepare, in December 2017, a project risk register assessing the risks of a termination for cause as opposed to other options;

6.      The increase in Contract amounts for VCM and FFKR as a result of the termination;

102208015.4 0010730-00431

7. The decision by VCM to reach out to OBI's subcontractors, and other possible general subcontractors to complete the work, and to contact a litigator as part of the overall decision process of whether to terminate OBI's Contract (Ex. 416);

8. The preparation by VCM of a risk analysis and schedule for SBT in the event the Contract was terminated for cause (Exs. 125, 148, 1721 and 1737);

9. Certain notes and testimony of SBT representatives that indicated that a termination for default of OBI's Contract was motivated by factors unrelated to OBI's performance or lack thereof;

10. The failure by SBT to allow Travelers adequate time to assess whether to complete the Project and the refusal by SBT to allow Travelers to complete the Project under a reservation of rights; and

11. The approval of OBI work for payment by SBT's consultants after the termination of the Contract.

SBT, in support of its contention that the decision to terminate the Contract was made in good faith, relies upon the following:

1. Failures of performance by OBI that were documented during the course of the Project;

2. SBT properly processed requests for additional time and compensation given the information submitted by OBI;

3. OBI failed, despite repeated requests and demands, to cure certain of the items of nonperformance;

4.     SBT representatives believed that a termination for cause was justified and was an appropriate course of action; and

5.     Due diligence required that, before SBT made any decision with respect to terminating the Contract for cause, to determine the risk, the likelihood of prevailing and who was available to complete the work including OBI's subcontractors, all in order to make the best possible decision.

OBI has the burden of proof to establish that the decision to terminate was made in bad faith. *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336 (2013); *Boarhog LLC v. United States*, 129 Fed. Cl. 130 (2016). In order to establish that SBT's termination of the Contract was in bad faith, OBI has a high bar to overcome. *TigerSwan*, 110 Fed. Cl. 336; *Custom Printing*, 51 Fed. Cl. 729 (2002). In determining whether a termination for convenience is proper, the government has considerable latitude. *Custom Printing*, 51 Fed. Cl. 729. "Due to this heavy burden, contractors have rarely succeeded in demonstrating the Government's bad faith." *Krygoski Constr.*, 94 F.3d at 1541.

There is some evidence from which it can be inferred that some representatives of SBT were not acting in good faith (Ex. 37, 2002, Lamcyzk Testimony, Exs. 2018, 2047).

However, considering all the evidence as a whole, there is insufficient evidence to support a finding that the decision to terminate the Contract for cause was made in bad faith.[3] Among others:

---

[3] OBI, by asserting bad faith to overcome the contract limitations for recovery under the termination for convenience, relies substantially on government contract cases. There is a question as to whether such cases apply to a contract between private parties. *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651 (Md. Ct. App. 2009). It is not necessary to decide this issue based on the decision that the termination was not in bad faith.

(continued . . .)

1. The issue of the termination of OBI for default was first raised by FFKR and not SBT;

2. FFKR and VCM, SBT's architect and construction manager respectively, documented, with some justification, continued concerns with OBI's performance during the course of the Project;

3. When the design issues initially appeared, SBT requested that FFKR immediately perform a quality assurance check on the design documents;

4. Mr. Fellows, SBT's construction representative, supported the termination of the Contract for default;

5. Mr. Tomlinson and Mr. Johnson of VCM both supported the decision to terminate the Contract for cause;

6. SBT, after receiving numerous complaints relating to the administration of TERO by Mr. Edmo, suspended Mr. Edmo;

7. SBT representatives, including Ms. Lavatta, made good-faith efforts to resolve the TERO issues and point out its effect on the ability of OBI to perform;

8. The termination plan (Ex. 418), risk analysis (Ex. 1721) and schedule for termination (Ex. 1737) prepared on behalf of SBT were all part of proper due diligence to determine the best alternative given the status of the dispute;

---

Similarly, it is not necessary to address OBI's claim that it is excused from performance by SBT's failure to allow Travelers to investigate and complete the Project with Vertex.

9. VCM prepared a "risk analysis" relating to the proposed termination for default that indicated, if SBT terminated the Contract for cause, as opposed to exercising other alternatives, that the Project may be completed earlier and at less cost; and

10. Mr. Small, the Tribal Council Chairman, was convinced the decision to terminate OBI for cause was justified.

## C. Relief Requested by OBI

### 1. Damages

OBI claims damages under the termination for convenience clause of $3,635,880.46 including $117,236.42 for administrative costs, any amounts it may owe its subcontractors and suppliers, $3,525,896.94 for lost profits, $477,816.42 additional direct damages and amount owing to Travelers arising out of the alleged bad-faith termination.[4] However, because the Panel has found that the evidence did not establish that the termination was in bad faith, OBI is limited under Paragraph 9.02(C) to recover only its reasonable direct costs, reasonable overhead and profit and reasonable administrative costs.

In support of these claims, OBI relies upon its financial records, accounting statements, job cost reports, project source documentation and audited financial statements (Exs. 182, 387, 1984 and 2060).

---

[4] OBI suffered financially as a result of the improper termination for default. While it is not necessary to decide the amount of lost profit on other projects in light of the determination that the decision to terminate was not made in bad faith, the Panel notes: 1) such damages must be proven with reasonable certainty and are subject to the defense that such claims are speculative, *NAJLA Assocs., Inc. v. Griffith & Co. of Va., Inc.*, 480 S.E.2d 492 (Va. 1997); *Topco, Inc. v. State, Dep't of Highways*, 912 P.2d 805 (Mont. 1996); 2) OBI's past profitability was uneven; and 3) OBI made a decision prior to the termination for default to discontinue bidding that would likely have adversely affected future profitability and, in particular, in 2017 and 2018 the years in which it is claiming lost profits.

SBT, on the other hand, claims OBI has suffered no damage and relies upon the following:

1.      OBI has been paid approximately $2,400,000 more than its actual costs;

2.      Certain of its claimed direct costs are not recoverable;

3.      Big-D has paid or will pay all of the amounts owed to the subcontractors and suppliers of OBI;

4.      OBI left the Project immediately after the termination so there should be little, if any, administration costs;

5.      There is insufficient support for certain claimed costs;

6.      OBI's margin, if it recovers any additional amounts, would be unreasonably high and exceed the margin in its estimate; and

7.      OBI is limited by the Contract on the amount it may recover and is not entitled to recover on a "total cost" basis.

Based upon a review of the evidence, the Panel finds the following:

1.      OBI is entitled to recover only the amounts allowed under Paragraph 9.02(C) and not under a total cost basis.

2.      Any amounts awarded to OBI must be reasonable.

3.      OBI's recovery under Paragraph 9.02(C) is not limited by either the line items or the amounts in its estimate for the Project.

4.      OBI is entitled to recover from SBT $74,481 for its unpaid reasonable direct costs and overhead and profit and $117,236.42 for its administrative costs for a total of $191,717.42.

Page 21   -   INTERIM AWARD

## 2.      Declaratory Relief

Claimant also requests an unspecified amount to compensate it for contingent liability for any unpaid amounts owed to subcontractors and suppliers for contract work, retainage, change orders and other amounts that may have been owed at the time of termination, but only to the extent such subcontractors and suppliers were not paid by SBT or Big-D.

The evidence indicated that it was likely that most, if not all, of any amounts owed by OBI to its subcontractors and suppliers as of the date of the termination have been or will be paid.  However, there was no certainty since the Project was not closed out and retainage, among possibly other amounts, had not been paid as of the close of the hearing.

As a result, the Panel will retain jurisdiction of OBI's claim for indemnification for such amounts until the Project is closed out to determine if there are any unpaid claims from subcontractors and suppliers of OBI and, if so, the extent to which OBI is entitled to indemnification from SBT.  In that regard, since all first-tier subcontractors (except one) have been assigned to Big-D (Exs. 2900-2908, 3921), SBT, through Big-D or otherwise, is directed to contact each such subcontractor and OBI is directed to contact each of its first-tier subcontractors and suppliers as to whether any of them have any claims against OBI in connection with the Project.  SBT and OBI shall provide declarations to the Panel no later than August 1, 2019, as to the status of any such claims.  At that time, the Panel will determine if additional proceedings are required.

Finally, OBI also requests indemnification from SBT for attorneys' fees and costs it may owe Travelers including, without limitation, costs relating to SBT's pending claim in Tribal Court against Travelers.  The Panel will retain jurisdiction of that claim and make a determination on whether and to what extent OBI is entitled to relief if and when OBI files

any such claim.  OBI shall file any such claim on or before August 1, 2019, and the Panel

will then determine if additional proceedings are required.

## VI.  INTERIM AWARD

Based upon the foregoing, an Interim Award is issued as follows:

1.      On OBI's First Claim for Relief, a declaration in favor of OBI and

against SBT that the termination for cause was not justified, is converted to a termination for

convenience and that the Panel will retain jurisdiction to determine what amounts, if any:

(A) OBI may owe subcontractors or suppliers as of the date of termination and the extent to

which OBI is entitled to indemnification or any other relief from SBT for such amounts; and

(B) OBI may be entitled to recover from SBT on account of attorneys' fees and costs

incurred by Travelers and for which OBI may be liable.  The Panel will determine whether

additional proceedings are required once the information required to be filed on or before

August 1, 2019, is received.

2.      On OBI's Second and Third Claims for Relief, an award in favor of

OBI and against SBT in the amount of $191,717.42 plus post-award interest on such amount

at 7.375% per annum from the date of the Interim Award.

3.      All other claims of OBI and SBT are denied.

4.      Any claims of OBI and SBT not specifically addressed are denied.

## VII.  ATTORNEYS' FEES AND COSTS

Any party claiming attorneys' fees or costs pursuant to this Interim Award shall file

its claim on or before June 19, 2019.  Any response shall be filed by June 28, 2019.  Any

reply shall be filed by July 8, 2019.  In the event either party requests oral argument in person

or by telephone on or before July 8, 2019, the matter will be set immediately for oral

argument. Absent any request for oral argument, any claims and costs will be decided based on the record. A Final Award on the claims addressed herein will then be issued incorporating the Interim Award and addressing any claims for attorneys' fees and costs.

DATED: June __6__, 2019.

_____
Richard E. Alexander,

_____
Christopher J. Snelling

_____
The Honorable Bruce Black

101212063 9 0010730-00431